IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| **JOHN DOE., A MINOR, THROUGH HIS PARENTS AND GUARDIANS, D.H. AND A.H.** | ) | |
| **PLAINTIFFS.** | ) | |
| **VS.** | ) | **NO. __________** |
| | ) | **JURY DEMANDED** |
| **HAMILTON COUNTY DEPARTMENT OF EDUCATION** | ) | |
| **DEFENDANT(S).** | ) | |

# COMPLAINT

**COMES THE PLAINTIFF, JOHN DOE**, through his parents, D.H. AND A.H., and counsel, submitting this Complaint and showing:

## I. PARTIES, JURISDICTION, AND VENUE

1. The Plaintiff is John Doe who is a citizen and resident of Hamilton County, Tennessee, where he attends public school. His case is brought through his natural parents, D.H., his father, and A.H., his mother, also citizens and residents of Hamilton County, who bring actions for themselves, individually, as Plaintiffs.

2. The Defendant, Hamilton County Department of Education (HCDE) is a governmental entity organized under the laws of the state of Tennessee, providing public education to students of Hamilton County. It receives federal funds.

3. This action arises from Section 1983 and the First Amendment to the United States Constitution along with the Fourteenth Amendment to the United States Constitution. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

4. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Hamilton County and the Defendant may be found in Hamilton County.

## II. FACTS

*September 9, 2024*

5. On September 9, 2024, the subject of "threats of mass violence" dominated student and staff conversations at Hunter Middle School.

6. In an assembly, a Hamilton County Sheriff's deputy warned students about Tennessee's new "mass violence" law and how *they* could be charged with a crime for not reporting threats they hear. Students were instructed to use HCDE's online "QuickTips" from their laptops to report threats upon pain of being charged with a crime themselves.

7. The subject of mass violence dominated the day of Jensen Morgan too, Hunter Middle School's Dean of Students. By 10:00 a.m., Morgan received a QuickTip from "Student X"[1] about a student pointing "finger guns." Morgan reported the student with the finger guns to Tony Mefford, a Hamilton County Sheriff's Deputy who served as the School Resource Officer (SRO).[2]

---

[1] Used for privacy, not his real name.

[2] Under a Memorandum of Understanding between the Sheriff's Department and HCDE, SROs assigned to schools are said to be employees of the County, Sheriff's Office, City, or Police Department. The SRO serves a hybrid function, being responsible for responding to criminal acts committed at school, but also carrying out school policies and laws. The latter permits an SRO to

8. Discussions continued in the classrooms. In John Doe's English class, a substitute teacher said the blinds should be drawn to prevent a "school shooter" from seeing inside the classroom. And students chatted about QuickTips they had submitted, including Student X's finger-gun-submission.

9. It was at that time, and in that context that John, tinkering with his wireless computer mouse battery, observed that "this [AA battery] could blow up the school" were it to explode. John's father works for an energy company and had cautioned him that batteries can explode. The AA battery said so itself:




10. Student X, who submitted the finger-gun QuickTip, along with another classmate, altered John's words and submitted QuickTips to Dean Morgan. They stated, respectively, that that "[John] was threatening to blow up the school" and "[John] would bomb the school" with the mouse battery.

11. Dean Morgan removed from English class and asked John some questions. John gave the context of his statement—the *battery* in a computer mouse could blow up the school. Morgan had John write out his speech: "So I puled [sic] out a battery from my mose [sic] and jokingly said this could blow up the school." Morgan searched Doe's belongings, confirmed he had

---

be part of a "threat assessment team" pursuant to Tennessee's mass violence law, as opposed to acting as a charging arm of the state.

no bombs, no weapons, and no plans for violence. Morgan knew that Doe was *obviously* not making a true threat of mass violence with his joke about the computer-mouse battery.

12. Without initiating a threat assessment, Morgan reported 12-year-old John's speech to the police, to SRO Mefford. Morgan's referral was for a "threat of mass violence." John confirmed his speech and context to SRO Mefford about the mouse battery.

13. With Morgan reporting an obviously *invalid* threat of mass violence to law enforcement, without including law enforcement on a threat assessment team, Mefford issued *Miranda* warnings to John. Mefford then arrested John, handcuffed him, charged him with a felony for making a "threat of mass violence," and took him by patrol car to the Hamilton County Juvenile Detention Center.

14. Later that afternoon, John's dad, D.H., pulled up to school to pick up John. There he met with a visibly shaken principal, Ms. Heidi Moses, who informed D.H. that John had made a threat of *mass violence,* that he had been expelled, arrested, and banned from school property. Even at that point, when penalties were delivered to the parent, no threat assessment had been performed—even though it was patently obvious John and his mouse-battery comment presented no valid threat.

*HCDE Conducts Threat Assessment <u>After</u> John is Handcuffed and Arrested for a Felony*

15. HCDE's student code of conduct recognizes four types of threats: (a) "School Threats (Threats of Mass Violence);" (b) "Verbal Threat – High Level;" (c) "Verbal Threat – Low Level;" and (d) "False Bomb or Shooter Threat."

16. A "threat of mass violence," the first type, is not any old threat. It is strictly defined by law as any act which "a reasonable person would conclude could lead to the serious bodily injury…or the death of two or more persons."[3]

17. The Tennessee General Assembly protected students who make *transient* threats, or even negligent threats, as opposed to valid threats of mass violence. That is, if the threat being assessed is *not* a valid threat of mass violence, then the student *shall not be expelled* or removed from their regular school.[4] But it was too late for that—HCDE already banned John, reported him to police, and he had already been arrested and charged with a felony. It had criminalized non-threatening speech, effectively making a *false* report of mass violence.

18. Use of "threat assessment teams" were hardly new. Under state law, school districts must establish threat assessment teams to prevent violence and "create a system" for safe schools.[5] They include law enforcement personnel who access confidential school records to determine genuineness of threat.[6]

19. After reporting John to police for his speech, and after John's arrest, HCDE went back and performed the mandatory threat assessment that afternoon of September 9, 2024. Morgan and Moses were the team members, but not the legally required "law enforcement officer."

---

[3] Tenn. Code Ann. § 39-16-517 (a)(1).

[4] Tenn. Code Ann. §49-6-3401(g)(5), (6).

[5] Tenn. Code Ann. §49-6-2701(a).

[6] *Id*. This role is different from law enforcement officers issuing probable cause for arrest. In fact, the Team's work is protected by the Family Educational Rights and Privacy Act (FERPA). *Id*. at (c).

20. The threat assessment team (Morgan and Moses) determined, obviously, that John was *not* making a valid threat of mass violence with his mouse-battery comment. In its FERPA-documentation, Morgan and Moses found John had no apparent intent, "no evidence or motive," "none" of the abilities to carry out the threat, "no expressions of anger or frustration," "no" evidence of specific planning, "no" repeated threats, "no accomplices," his weapons were "none," and, again, he made "no" valid threat of mass violence.

21. By performing the threat assessment at the end, instead of the beginning, it was too late for John. Morgan had already accused John of making a valid threat of mass violence to police who arrested him and charged him with a felony. And Moses had already banned John from school based upon the resulting charge of felony. In other words, the discipline resulted from the (unconstitutional) referral and subsequent arrest.

22. Doing it backwards, HCDE severely harmed John. Normally, even a "low level" threat carries a *maximum* two days of in-school suspension. But having performed the threat assessment at the end, *after* reporting John to law enforcement where he was charged with a felony, HCDE expelled him from school. Thus, for *not* making a valid threat of mass violence, HCDE documented the "Final Outcome" in its threat assessment report: it both expelled Doe from school and had him "arrested by law enforcement."

*Injunctive Relief is Necessary to Address HCDE's Widespread Custom and Practice*

23. HCDE's failures were entirely foreseeable. Contrary to the law and HCDE policy, on September 6, 2024, HCDE's superintendent advised all students and parents that threats of mass violence, "*regardless of intent or ability to carry out,*" must be charged as a felony. This is wildly inaccurate, irresponsible, and serves to harm innocent children like John.

24. Also on September 6, 2024, the Community Schools Coordinator for Hamilton County Schools advised all students and families that assessment protocols are followed "without regard to … the actual intent of the student." Again, this is wildly inaccurate and harmful.

25. On September 22, 2024, HCDE's superintendent expressed a mistaken belief that HCDE had no ability to discern valid and invalid threats: "But what we are also saying is we think there should be, working alongside law enforcement, working other law enforcement agencies, that when we have a student that did not make a valid threat, that there should be the ability for discretion when choosing to charge that student with a felony."

26. But there is. Adequate training for HCDE's school personnel is necessary to distinguish "transient" threats, or non-threats, by students from *valid* threats of mass violence. Such training and models are available. For example, the Comprehensive School Threat Assessment Guidelines (CSTAG) is an evidence-based model for schools to use in conducting threat assessments in K-12 schools.[7] It recognizes that: "Youth frequently make threatening statements that are not serious and engage in aggressive behavior that ranges from horseplay to serious assault. It is important not to over-react."[8] It uses the threat assessment to distinguish "transient threats," a broad category of threats—"most threats"—which do *not* reflect a genuine intent to harm others.[9]

---

[7] Available at https://education.virginia.edu/documents/yvpcomprehensive-school-threat-assessment-guidelines-overviewpaper2020-05-26pdf (last visited March 6, 2025)
[8] *Id.*
[9] *Id.*

27. Transient threats, or non-threats, can be quickly and readily resolved because the threat is an expression of feelings and does not reflect a substantive intent to harm someone.[10] They are handled at the school level without reporting the student to police for a felony charge.

28. HCDE's custom and practice, from the top down, is one of deliberate *overreaction*. In cases where violence is obviously not imminent, including transient threats and non-threats, HCDE refers them to police and then belatedly determines the report was an *invalid* threat of mass violence.

29. The field-study-tested CSTAG utilizes safeguards for statements which are *not a threat* and it is consistent with Tennessee law:

*[see graphic next page]*

[10] In a field test of these guidelines in 35 primary and secondary schools that responded to 188 threats of violence, approximately 70 percent of the cases were resolved as transient threats.



**THREAT ASSESSMENT AND RESPONSE PROTOCOL©**

Comprehensive School Threat Assessment Guidelines

**OVERVIEW**

A threat typically is a communication of intent to harm someone that may be spoken, written, gestured, or expressed in some other form, such as via text messaging or other digital means. An expression of intent to harm someone is considered a threat regardless of whether it is communicated to the intended target(s) and regardless of whether the intended target is aware of the threat. Threats also may be implied by behavior that an observer would reasonably regard as threatening, planning, or preparing to commit a violent act. When in doubt, treat the communication or behavior as a threat and conduct a threat assessment. Threats that are not easily recognized as harmless (e.g., an obvious joke that worries no one) should be reported to the school administrator or other team members. The administrator or another team member makes a preliminary determination of the seriousness of the threat, in consultation with one or more team members. The student, targets of the threat, and other witnesses should be interviewed to obtain information using this protocol. A *transient* threat means there is no sustained intent to harm and a *substantive* threat means the intent is present (or not clear) and therefore requires protective action. This form is a guide for conducting a threat assessment, but each case may have unique features that require some modification.

A threat assessment is not a crisis response. If there is indication that violence is imminent (e.g., person has a firearm at school or is on the way to school to attack someone), a crisis response is appropriate. Take immediate action such as calling 911 and follow the school crisis response plan.

**School Threat Assessment Decision Tree***

**Step 1. Evaluate the threat.**
Obtain a detailed account of the threat, usually by interviewing the person who made the threat, the intended victim, and other witnesses. Write the exact content of the threat and key observations by each party. Consider the circumstances in which the threat was made and the student's intentions. Is there communication of intent to harm someone or behavior suggesting intent to harm?

No → Not a threat. Might be an expression of anger that merits attention.

Yes ↓

**Step 2. Attempt to resolve the threat as transient.**
Is the threat an expression of humor, rhetoric, anger, or frustration that can be easily resolved so that there is no intent to harm? Does the person retract the threat or offer an explanation and/or apology that indicates no future intent to harm anyone?

Yes → Case resolved as transient; add services as needed.

No ↓

**Step 3. Respond to a substantive threat.**
For all substantive threats:

a. Take precautions to protect potential victims.
b. Warn intended victim and parents.
c. Look for ways to resolve conflict.
d. Discipline student, when appropriate.

Serious means a threat to hit, fight, or beat up whereas very serious means a threat to kill, rape, or cause severe injury with a weapon.

Serious → Case resolved as serious substantive threat; add services as needed.

Very Serious ↓

**Step 4. Conduct a safety evaluation for a very serious substantive threat.**
In addition to a-d above, the student may be briefly placed elsewhere or suspended pending completion of the following:

e. Screen student for mental health services and counseling; refer as needed.
f. Law enforcement investigation for evidence of planning and preparation, criminal activity.
g. Develop safety plan that reduces risk and addresses student needs. Plan should include review of Individual Educational Plan if already receiving special education services and further assessment if possible disability.

↓

**Step 5. Implement and monitor the safety plan.**
Document the plan.
Maintain contact with the student.
Monitor whether plan is working and revise as needed.

30. Accurately distinguishing between transient and substantive threats helps the school-team both to avoid over-reacting to threats that are not serious and to focus its attention on serious threats that merit protective action. Without training on correct procedure with a correct model, HCDE will continue violating students' rights under the First Amendment. From the top down, HCDE is mis-educating all educators that transient and non-threats must be reported to police as threats of mass violence—defeating the purpose of the mass violence law and harming innocent children.

*John's Appeal*

31. HCDE does not afford a legitimate appeal option where it falsely reports students with mass violence to police. HCDE did provide the family a "Notice of Expulsion" including a section called "Due Process Rights." And that does state that an appeal of the expulsion may be made within five days by calling HCDE's Chief Equity Officer, Marsha Drake.

32. On September 9, 2024, after the arrest and being banned from school, John's family placed the call for appeal to Ms. Drake. Ms. Drake initially advised the family that "Zero Tolerance" offenses are not eligible for an appeal.

33. The family pointed out how the Notice states "all expulsions" are subject to appeal. Ms. Drake elaborated that, once HCDE turned John over to law enforcement who charged him with a felony, the appeal could not change the outcome. Rather, HCDE would defer to the *juvenile court* rather than its own threat assessment findings. Thus, even though John Doe was found *not* to be a valid threat of mass violence, and HCDE had made an *invalid* report, it did not matter. His appeal could not override the proceedings in criminal court that HCDE had unleashed. Thus, in spite of the threat assessment safeguard, John *would* continue to be banned from school all because HCDE jumped the gun and reported John to law enforcement for an obviously invalid threat.[11]

34. With the appeal being foreclosed, and John banned from school property, the family has incurred the expense of homeschooling John. But even more damaging, John has suffered emotional harm from Defendants' conscious-shocking decision-making and clear lack of training. An honor roll student without a negative disciplinary history, HCDE impugned his good name, his

[11] Tenn. Code Ann. §49-6-3401(g)(6).

honor, and his integrity by making a knee-jerk false report of a crime to law enforcement as a matter of custom and practice—all in violation of the Constitution of the United States.

35. Similarly, HCDE has caused emotional harm to the parents, D.H. and A.H., as they witnessed the shocking arrest and detention and expulsion of their son for what even HCDE determined was *not* a threat of mass violence.

## III. Legal Claims

### Count 1. Section 1983 and First Amendment

36. HCDE is deciding that speech—here the statement of a boy with a double-A mouse battery—is *not* a true threat (or any threat), but it has already criminalized that speech by reporting him to police outside of a threat assessment team.

37. The First Amendment protects the right to free expression. A key exception concerns "*true threats*" of violence. "[T]he 'true' in that term distinguishes [true threats] from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late.')."[12] John Doe's speech was exactly that kind of hyperbole, or joking, about how a computer-mouse battery exploding could blow up a school. His speech was not a "true" threat.

38. Doe's speech was either a true and non-threatening statement that a AA battery can explode and blow up the school building *or,* at worst, a poor joke by a 12-year-old. But his speech was not a "true" threat as HCDE concluded after-the-fact.

---

[12] *Watts v. United States*, 394 U.S. 705, 708 (1969) in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

39. Nor did Doe's speech "*substantially and materially disrupt*" the learning environment.[13] He was not indecent, lewd, or vulgar with his speech. Doe's teacher continued teaching. There was no evacuation, no instructional breaks, no material and substantial disruption.

40. HCDE's decision to report Doe to law enforcement under these circumstances and, then, remove him from school altogether violates the First Amendment. Additionally, under Section 1983, HCDE was deliberately indifferent by failing to train its decision-makers and policy makers about not reporting as a crime what was obviously *not* a true threat. This caused Doe both educational and emotional harm.

41. Defendant, under color of state law, infringed on Doe's First Amendment rights and did so with deliberate indifference.

**<u>Count 2. Section 1983 and Fourteenth Amendment Substantive Due Process</u>.**

42. Defendants deprived DOE of a liberty or property interest,[14] under color of law, in a conscious shocking manner by expelling him for stating that computer mouse batteries could blow up the school. Defendants clearly knew this was *not* a valid threat of mass violence but treated it as so anyway—without performing a threat assessment in conformity with Tennessee law. Defendants violated DOE's substantive due process rights by expelling him.

43. **<u>Section 1983 and Fourteenth Amendment Procedural Due Process</u>**. Defendant HCDE took away DOE's public education without adhering to minimum process required by the Due Process Clause. Defendant HCDE denied DOE an appeal to present his side of the story to an unbiased decision-maker without a predetermined outcome due to pending criminal charges. As a

---

[13] *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503 (1969).
[14] Tennessee students enjoy a property interest in education.

result, DOE did experience "unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss v. Lopez,* 419 U.S. 565, 581 (1975). It was impossible to "respond, explain and defend," to be heard at a meaningful time in a meaningful manner, when the outcome of being removed from school are predetermined.

For relief, Plaintiffs seek:

a. Declaratory relief of the Constitutional violations.

b. Injunctive relief to include return of Plaintiff John Doe to his regular school.

c. Injunctive relief to include training and modeling of the correct application of Tennessee's mass violence law, including timely use of threat assessments, distinguishing transient threats and non-threats to avoid violation.

d. Compensation for humiliation, mental anguish, and damage to John Doe's reputation.[15]

e. Compensation for mental anguish to the parents, D.H. and A.H..

f. Compensation for the costs of education while John Doe is banned from school.

g. Nominal damages for the Constitutional violations.[16]

h. Attorneys' fees and costs. 42 U.S.C. §1988(b); 42 U.S.C. §1983.

i. A jury is demanded for all claims triable by jury.

---

[15] A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages … are mandatory.").

[16] *Carey v. Phiphus*, 435 U.S. 247, 266-67 (1978).

Respectfully submitted,

/s Justin S. Gilbert
Justin S. Gilbert
Gilbert Law, PLLC.
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

&

**SAILER LAW, PLLC**

/s/ Christopher J. Sailer______________________
Christopher J. Sailer
(TN Bar No. 039917, TX Bar No. 24104989)
2809 Kingston Pike
Knoxville, TN 37919
Telephone: 865-558-7709
csailer@pdknox.org